The next case is AngioScore, Inc. v. TriReme Medical, 16-1126 AngioScore, Inc. v. TriReme Medical, 16-1126 AngioScore, Inc. v. TriReme Medical, 16-1126 AngioScore, Inc. v. TriReme Medical, 16-1126 You know, I think that's a fair point. The courts have been looking at both because it's operative facts, so operative you have to, and the Supreme Court standard is claims, so you have to know what the claims are and then the core facts that prove those claims. And here you have a fiduciary duty case, it's a state case, and then a federal patent case. And if you look at both the claims and the facts that prove them, they're distinct. In the state case, you have just the relationship between the company and the board member, this invention, and whether this company had any interest in either acquiring or developing chocolate. And this all occurs by February 2010. These events are all over. Now, the patent case starts two years later, and that case centers around this validity of a completely different product, AngioScore had this 119 patent that was never practiced, and whether chocolate's elements infringe that. And those facts were the prior art on the 119 patent, and whether chocolate had these so-called end-to-end struts, and whether any of these struts attached to the catheter shaft, and I hope I have all the technical stuff, but it's just looking at the two, 119 patent and the chocolate device. And I think the proof is in the pudding. There's a 110-page state law opinion by the district court and 224 findings of fact, and not a single word mentions the 119 patent. And if you go to the patent trial, no party even mentioned the state law claims or Dr. Constantino's fiduciary duty. Is there an overlap here in the facts with respect to damages? So you're definitely looking at the sales, you looked at the sales of chocolate on the one hand, and what AngioScope did, but no. So the damages facts on, and the common damages expert was on completely different theories, because one is based on the fiduciary duty claim is based on chocolate never having been on the market. So just if AngioScope had sold more sales. And I think in the patent case, it's a very traditional royalty based on the sales of chocolate. So the expert, even though the same expert testified in both trials, it was on completely separate theories. And the only other thing I'd like to say, just... Are you aware of any cases where they found supplemental jurisdiction just based upon overlapping damages theories? No. No, and I just wanted to give out a hypo if I could, because I think what the district court said is that chocolate was the heart of the case. And just the fact that the same product features in both cases can't be sufficient. And as for instance, if you imagine a plaintiff who brings an admiralty case in federal court arising out of a boating accident, he can't add a state law claim that says the defendant stole that boat for him two years ago. And I think just the same is true here. Although chocolate, it certainly features in both cases, the core facts about chocolate are just different in each case. And that's all I wanted to say about subject matter jurisdiction. I wanted to go to corporate opportunity, unless you want me to stay. Although if we agree with you on that, that gets rid of most of the case, except for your attorney fees case on the patent side? Yeah, that's correct. That's correct. And I think it does... If we're going to talk about corporate opportunity, all the craziness of that doctrine and the way it was applied here really should have led the court to not embark upon very scary and choppy waters of Delaware law because of all the questions that that raises about assuming that the corporate opportunity doctrine could apply to a director's own patentable ideas. And the three basic problems with that are, and they are serious, is that under Delaware law, fiduciaries have the right to prepare to compete. Federal law, you need an express assignment before divesting inventors of their patent rights. And third, the right the court created, which was this right to acquire ownership, is quite unworkable, and it suffers all the same problems of stifling innovation of the implied right of outright ownership that the court held and recognized was untenable. So first turning to the right to prepare to compete, Delaware law already has a doctrine of the breach of loyalty that applies when a fiduciary uses his or her own skills and ingenuity, and it's called the duty not to compete. But 25 years ago, in that science accessory case that the Delaware Supreme Court issued, the court held that fiduciaries can prepare to compete, but they have to resign before they actually compete. And preparing to compete in that case was soliciting investors, developing an invention, and doing a working model. And this is critical in this case because that court held that fiduciaries have no duty, no duty of disclosure, and can conceal any and all plans to compete. So I'd like to give you another hypo, if I could, of Picasso. Assume that Picasso was working, excuse me, Picasso was on the board of an art gallery. Picasso can paint all he wants. He doesn't have to tell the art gallery. He just can't sell his paintings. But Dr. Constantino here never sold a painting when he was on the board. He resigned from the board in 2010, and that was almost two years before he ever sold the chocolate device. But the court below held that this doctrine, excuse me, the corporate opportunity doctrine prevented any kind of development and any kind of solicitation of investors without first disclosing any and all preparations and plans to compete. But that perversely construes Delaware law to penalize and punish the very conduct, i.e. concealment and disclosure, that Delaware law affirmatively encourages in order to stimulate competition and industry. The court in that case said we have to have, you have to be able to, in effect, lie to your employer or lie to your corporation about plans to compete. As long as you're out of there before you actually compete, otherwise we wouldn't have competition. And that's, frankly, how lawyers can leave their law firms too. They don't have to go around and disclose that. And you see this other mismatch when the court says, well, the doctor here went beyond preparing to compete because he usurped a corporate opportunity, albeit it was one he created. But both the duty not to compete and the duty not to usurp corporate opportunities are merely subspecies of this broader duty of loyalty. And if designing a valuable invention and concealing those plans are okay under the duty not to compete, they're not usurping a corporate opportunity either. And our second point, which is that federal law encourages an express assignment before you can be divested of your rights, if you think about what happens here,  can acquire these ownership rights, they acquire them instantly a second pops into the idea of a board member. And it's already too late for the board member to resign. He's already thought of the idea. He thinks, oh, I'm going to invent a light bulb. Well, now I'm... Why wouldn't the design or the planning, the making of the chocolate device not be viewed as infringing? Be viewed as a what? Infringing. So the 119 patent hadn't even issued  And I don't know how you infringe by just thinking of an idea. You would definitely know that more than me. But there is a 119 patent. And my understanding of the way the courts have construed making, using or selling is you actually have to start developing and manufacturing it. I don't just think thinking of something in your mind or going talk... If you go talk to an investors, if Picasso said, would somebody think about investing or helping me buy my paints and I'm thinking about Guernica, I don't see how that... Somebody could say that's an infringement about something you thought of. But I'm going to defer to you on the law of infringement. Excuse me. Since we've interrupted your chain of thought, let me interrupt it a step further. Sure. In my years on the court, I haven't run into this duty of loyalty issue very often. And I'm a little puzzled by... Is it the case that the law regarding the fiduciary duty of a director and duty of loyalty includes the encouragement to lie to the employer? So Science Accessories uses the word he secreted, S-E-C-R-E-T-E-D, and concealment. So... And then it talks about you can't... Fiduciaries have no duty to talk about your plans to compete. So... And it says, it expressly says this, we have to do this to encourage industry and free competition. But also keep in mind, this is a quarter of a century ago. This is not like some newfangled theory that Delaware law came out two years ago. So it has been the law for a quarter of a century in Delaware that fiduciaries don't have a duty of disclosure. And this is one of the huge problems with this case, is that the court held that this... That an implied right of outright ownership was just completely untenable because that would subvert all ingenuity and innovation. But then the court turned around in its damages award and said, oh, Angius Court didn't assume that Angius Court paid zero for the right. And so the court essentially imposed the very same implied right of outright ownership that the court held was just untenable. And so the court... The third problem with this is just imagine, because this right which you're talking about, this right of just to offer, or whatever it is, I don't even know what the court said, but the court said that it's an implied right to acquire ownership. And the problem with that one is it just doesn't work and has its own problems. And just think about it again. If the corporation can exercise this right on whatever terms it chooses, then this just reduces to the untenable right that the court just rejected. Now, if it's something less than that, then parties are left in hopeless deadlock if they can't reach a mutual agreement, even if both sides are acting in good faith. I mean, that's a mediation. Parties all the time think their claims are worth X, Y, and Z, and the other side thinks it's not worth X, Y, and Z, and they're both acting in good faith. What would be the effect if we conclude that the court... that there was no common nucleus of operative fact? Then the case is over, as Judge Hughes said, except for attorney's fees, and I've wasted, you know, five minutes. I would have thought that would have been your strongest argument, but you sort of went through it rather quickly. Well, we can go back. I mean, the reason why I think the merits... that this is so... you know, that even if there was not... even if there was one, because the cases were bifurcated, and this was such a novel duty and an extension of Delaware law, the court would have abused its discretion. But most of our brief is devoted to the subject matter jurisdiction argument because of all the concessions and the other side's briefing and the strangeness of... and the time periods being so distinct. I see. Okay, let's hear from Ms. Pritchfield. Good morning, Your Honor. Good morning. Angioscore's claim for breach of fiduciary duty is barred by the three-year statute of limitations in addition to the arguments that my co-counsel just made. The record here is uncontroverted. No one at Angioscore was misled, and Angioscore believed at all times that Dr. Constantino was developing competitive products, including chocolate, while sitting on the board. Although chocolate had... Excuse me. Although Angioscore had the burden of proof on tolling, no one from Angioscore denied that they had notice of the facts of the development of a competitive device by Dr. Constantino, and no one testified at trial, not a single Angioscore witness, that they had been misled. This evidence was ignored in its entirety by the district court, and it overwhelmingly demonstrates that Angioscore not only suspected, they in fact knew from their conversation with Dr. Constantino on February 3rd, 2010, that Dr. Constantino was working on a competitive specialty balloon product while sitting on the board. In fact, at the time, the CEO, Mr. Trotter, directly accused Dr. Constantino of breaching his fiduciary duty in a number of emails and letters, but Angioscore made a deliberate and a strategic business decision not to file suit, then or at any time in the following three years, and they didn't seek to add fiduciary duty claims to the patent suit until May 2014, long after the statute of limitations had run and because the corporate defendants had had a successful IPO and raised funds. The district court erred in failing to dismiss these claims as time-barred. Instead, the court found, contrary to all the evidence, that Angioscore was not on inquiry notice of its claims and that the limitations period was told. There is no evidence to support these findings. Delaware law requires that once a plaintiff is suspicious of wrongdoing, just suspicious, the plaintiff is obligated to diligently investigate and file within the limitations period. Angioscore was suspicious, Angioscore investigated, and Angioscore garnered all of the evidence it needed to bring the very claims it brought, yet it chose not to file suit. Let me go into some of the detail here. It's undisputed that Dr. Constantino disclosed his development of a specialty balloon to Angioscore's CEO, Trotter, in February 2010. Angioscore immediately asked Dr. Constantino to resign due to an alleged conflict and after determining that their insurance would not reimburse a judgment. At that point in time, that's the first time that they learned that Mr. Constantino planned to enter into the specialty balloon market. Yes, February 3rd, 2010, and by February 5th, 2010. Before that time, they thought he was just working on something. They didn't know he was working on a specialty balloon. I believe they did not. I believe they did not, but February 3rd, 2010 is more than four years before they actually brought the claims, and one of the things that I think is very telling, the court rested its decision basically on these two letters that were written by Dr. Constantino's counsel after he had resigned from the board, after he was no longer a fiduciary, and she said, you know, these letters were misleading. Well, what's interesting about that is how no one was misled. The CEO, Mr. Trotter, testified at trial that he didn't think the letters were truthful, and there was evidence from other board members and even third parties that at that time... Well, in the first letter, he denied any involvement in any development work or licensing of angioplasty technology that involves specialized features such as scoring, cutting, and those two items, the scoring and the cutting, that was the technology of these catheters or stents. That was not the technology of chocolate, however. Chocolate was not a scoring catheter. Chocolate operated by having these little pillows and grooves. It was a completely new and different way of doing it, and that's why... In fact, the argument is that the metal parts didn't actually touch the inside of the vein or whatever. It was the pillows. That's my understanding, Your Honor. Under your invention. And what I think is interesting, and the point that I wanted to bring out, is that these letters were really the centerpiece of the court saying, oh, there was an intent. You know, the lawyer that wrote these letters, he didn't have all the facts. There was an intent to deceive. After receiving these letters, both of these letters, Angioscore went to its insurance company to find out... And this is after reading these letters. They didn't believe anything in those letters. They were convinced that Dr. Constantino was in the throes of developing a competitive angioplasty product. They went to their D&O carrier and said, we'd like to sue, basically, and will you cover any judgment? Could you conclude for us, please? You're out of time. Oh, sorry, Your Honor. And what I was going to say is the fact that they were intending to sue him in 2010 after all of the evidence the court relied on and continued to feel that way throughout the limitations period, tracking the device, 510K, the patent application. This was not a case where there was any fraudulent concealment because nobody was misled. Thank you. One quick question for you, which is, is it customary in this stent industry to name products  I'm afraid I can't answer that, Your Honor. I think what's customary is to try to be somewhat unique in naming your product. And chocolate was certainly a unique name. Okay. Thank you. The record does not reflect the answer to the court's question about naming ice cream. About naming. Yes. I couldn't find anything in the record on that. I can tell you why if you'd like, but not on my time. Robert Feldman for the plaintiff. I'd like to address, if I might, subject matter jurisdiction. The operation of the chocolate device was front and center in both claims. You can see that, among other places, in Judge Rogers' written ruling on substantive summary judgment motion, in which she said, defendants argue the technical differences, the technical differences, between angioscore and chocolate, angiosculpt and chocolate, to conclude that they do not fall in the same line of business. Line of business being an element of the breach of fiduciary duty claim. The technical operation of the chocolate product was front and center in the breach of fiduciary duty case. You know better than anyone that the operation of the product would be front and center in the patent case. It's not just what Judge Rogers said. There are sites in the briefs and in the record before you. The sites in the brief are at footnote eight, at which we set forth the number of places in which, as just one example, scoring, whether this device scored, was a central issue in the breach of fiduciary duty case and a central issue in the patent case. There are citations to the record, actual record sites, in footnote eight of our brief. Since it's important and since your brief, if I would be permitted to cite two additional sites in the record that are not in our brief but are in the record that reflect that scoring was front and center in both cases. Mr. Feldman, while you're on that point, what state the common nucleus of operative fact that connects the patent case to this supplemental jurisdiction issue? Scoring is one. I don't see how that really is an operative fact in the question of whether there was a breach. I can explain that to you. Okay. To be more general and specific at the same time, the first common operative fact is how the product worked. The same product, chocolate. How it operated. What Rogers said in her summary judgment order with respect to the fiduciary duty claim was critical because the defendants claimed that because the product operated differently according to them, my clients would not have been interested and it was not in my clients' line of business. That was a major part of the fiduciary breach trial. How the product operated   second common operative fact is whether my clients would have been interested. You have not had to grapple, not that there's much grappling required, with the elements of a breach of fiduciary duty claim under Delaware law, but it includes whether the product at issue is within my clients' line of business, whether it would have been something that my clients would have had an interest and expectancy in, and whether by pursuing it while he was on the board, he put himself in a position that was inimical to our client. Well, that would be relevant to the supplemental jurisdiction. Yes. But that's not relevant to the patent case. It certainly is. You would know better than I that how the product operates is exactly what... Okay, that's one item, how the product operates. What else? Anything else? Yes, of course, but let me respond because I detect a note of skepticism. In the patent case, the question is how does the product operate? And that consumed an enormous amount of time. In fact, that was the bulk of the patent case as well. So the issue of how the product operates is one of the common operative facts. The second common operative fact is Constantino's role at Angio score. That was based on his role at Angio score. When he was at Angio score, in the patent case, excuse me, back up, his role at Angio score was obviously front and center in the breach of fiduciary duty case. And in the patent case, we relied on his role at Angio score for the following things among others. Number one, that he approved the purchase of the patent application as a director, and as CEO, in fact, that became the 119 patent, showing that he believed it was valid. Second, we relied on his knowledge of the 119 patent from his time at Angio score in an attempt to show willfulness. So his role was the second common nucleus of operative fact. The third was the extent of competition between the companies. The same experts addressed the role of competition between the two companies in both cases. I appreciate your Honor's comment. The same expert addressed the extent of competition between Angio score and Trireme in both cases. In the breach of fiduciary duty case, it was important to show the extent of competition for both liability and damages. It showed that it was the same line of business, that he placed himself in an inimical position to my client, and it certainly showed lost profits. Likewise, in the patent case, the extent of competition was important as one of the key Georgia-Pacific factors. In this case, it was the key Georgia-Pacific factor. That goes to damages. It doesn't go to the fundamental question of infringement. Well, certainly, there's no case that distinguishes between liability and damages for determining whether there is a common nucleus of operative fact. And the fourth thing ... Are you aware of any cases that find supplemental jurisdiction based upon just overlap and damages? No, I'm not. I don't think there is any such case, but that's not the only thing that we have. I actually think that in an appropriate case, if the only overlap were damages, depending upon the role of damages in a given trial, it might or might not. But the conduct of the patent case is what produced the documents that put us on inquiry notice of what actually had happened. Until the documents were produced in the patent case ... Well, that can't be the grounds for supplemental jurisdiction, can it? I mean, you can come up with all kinds of state      law, but the guidelines that were set forth in that case and in a case called Guth required the court to balance the equities, set forth  test for the plaintiff to prove, and a four-part test for the defendant to take advantage of. There are, the Supreme Court said, there's a ninth factor, not one that the Delaware Supreme Court listed, but a ninth factor, this business about invention, that is dispositive. So far from adhering to Delaware law, which as I said, Your Honor, is well established and has two four-part tests, the defendant would seek to urge upon you a ninth factor, and not withstanding the Delaware Supreme Court saying that these, no factor is dispositive, they're all for the court to balance, and they're all to be considered, they would say that by virtue of the defendant supposedly coming up with this by himself, he is somehow exonerated. I would suggest to you that this is an unusual case for that argument to be made, since the very first finding of fact by the court, and something that the defendants proclaim, is that this was jointly come up with by the defendant, Constantino, and one of his friends. And it defies common sense to suggest that whether a director comes up with something by himself, or it's suggested to him, or it's presented to him, should determine whether or not a fiduciary duty is breached or observed. And I would say that the law of fiduciary duty does not suggest that directors or lawyers are supposed to lie to people, and it certainly doesn't countenance what happened in this case. So for example, your honor, at A61656 of the record, Constantino, while he was the director of the company, compared Angioscope and Chocolate, and said that Chocolate was a step up over Angioscope while he was on the board. He said that the dissection rate, which means the bad failure rate of Chocolate was better than Angioscope's dissection rate while he was on the board, 61656. He said it was a step up, A151. So that is not what the Delaware Supreme Court had in mind. With respect to the statute of limitations, I would say the following. The district court entered an order that said that my clients had acted diligently. To be very clear, I want to be very clear about this, she also found that Constantino deceived his lawyers and my client. The lawyers wrote that this was a very specific factual finding that he deceived his lawyers. So let there be no confusion about who was responsible for that letter. That finding was at A155. But the real facts here are that there were two letters. A law firm wrote twice to Dr. Constantino to try to find out what he had done. He said I hadn't done anything. False, the court found. And at the conclusion of those letters, Angioscore had no information about what he had done. It had no information about what the product was. So it could not have sued had it wanted to. All it could have said was we understand he may be going into specialty balloons. We don't know what the balloon is and we don't know whether he's actually worked on it. Except that it turned out he had. So the court was entirely correct in its factual finding that he had deceived my client and his lawyers. There's one thing in the reply brief that I would mention and then I'll sit down here. There's a reference to a disclosure that he had found financing or he was looking for financing. I would point out to the court, this is not in our brief but it is in the record, that Mr. Trotter, this is an A-91,  Trotter just assisted his fellow director in attempting to find financing. That's an A-91. And in the March 21st letter and in the conversation that they had about Glider in December, it was clear that this company that we're looking for financing, there's no statement about that financing being tied directly to specialty balloons. Unless the court has any questions. The reason it's called chocolate is because the pillows stick up and somebody thought it looked like a chocolate bar. That's not my fault. Thank you. May it please the court. There is one more question. So if it's okay with you, I'm going to go upside down from where his argument went. I wouldn't say. Dogs are allergic to chocolate. It seemed to me that the primary argument on the jurisdiction was that how this product worked was overlapping both claims of infringement. It's clear how it goes to infringement. I'm still a little fuzzy on how it goes to the fiduciary duty or not. We'll start there. He kept saying it was front and center and how the product operates. He was fuzzy on what he meant by that. The scoring was relevant and discussed in the article. Our side mentioned scoring. It was icing on the cake. It was more on the way that it can't be equivalent. Most of it was the attachment to the catheter shaft. This is a response that goes to all of it. It has to be the core. I can't believe I looked on Google images what a core looks like. It can't be the membrane. It has to be the center. You can go to those sites. I don't think they will help them. The second one was his role. His main thing was on willfulness. I'm very surprised by this. At the pre-trial conference, that lawyer conceded that he would not rely on anything dealing with the state law case because it was not helpful. Willfulness was not mentioned in the patent trial. I checked on that. The closing argument made a passing reference. I could argue willfulness, but I'm not. I don't understand that argument. The third one is on the competition. That is a more curious argument. This 119 patent never practiced. It could have been owned by one of you or me. It didn't have to exist. The final thing is the discovery and I think that you could make the same thing about the boat case. It has to be the core. Just briefly on the corporate liability, the comparison of the two products to the investors, I'm surprised he didn't mention science accessory because that is what the director did there. He compared his product in an investor perspective. That is one of the things you would talk about. That is covered squarely by that case. If I could do another example, why does it matter if it is a third party? When Picasso is painting, the federal right is vindicated if he can sell his invention when he leaves. If Picasso is on the board member and Matisse and Moreau come to him and say I have a painting, Picasso has to turn that over. He can't go with them. The turnover right, Matisse is going to get paid. The other thing is when you have Matisse presenting this opportunity, you know what you are talking about. Here we have no clue what this thing is. It didn't tell us if it was an option right, option price, royalty, what the procedures. The duty when you have your third party, it arises at presentment. Here the court held the duty arises the instant an idea becomes concrete. Concrete enough to file a patent application. An idea becomes concrete. Picasso could say do you want to buy my next painting. That would be quite marketable. You might have to have a whole bunch of patent applications. That's another problem. The third party, you have the actual right of issue being articulated, the inventor getting paid and the first reason is at least Delaware already has a doctrinal box. It's just the wrong analytical box. Thank you very much. That's it for today. The court sits under the bench.  you very much.